## DICKERMAN *vs.* ABRAHAMS and wife.

Where a married woman has a separate estate, which she holds to her own exclusive use, free from the control or disposition of her husband, and individuals furnish work, labor and materials for the erection of a house upon it, upon the express agreement and promise of the owner that the same shall be paid for out of her separate estate, a court of equity has jurisdiction to enforce payment out of her separate estate, as a charge thereon. WRIGHT, J. dissented.

A creditor, before he can succeed in charging the separate estate of a married woman with the payment of his debt, must show not only that she contracted the debt, but that it was contracted either for the benefit of her separate estate, or for her own benefit, upon the credit of such estate.

In such a case the debt is enforced as a charge, and not as a personal liability. The judgment is *in rem*, and not *in personam*.

THIS was an appeal from a judgment rendered at the Rensselaer circuit, in February, 1854, Justice WATSON presiding. The plaintiff alleged in his complaint that, at the special instance and request of Mrs. Abrahams, he had furnished materials for the building of a house for her, upon her separate estate, to a specified amount, and that, in consideration that he would furnish such materials, she had agreed that she would pay for the same out of her separate estate, and appointed the same to be paid for out of such separate estate. The plaintiff claimed judgment for the amount of his demand, with interest, to be collected of the separate property of Mrs. Abrahams, with the costs of the action. The defendants, by their answer, denied the allegations in the complaint, and averred that the materials were furnished upon the credit, and at the special instance and request of the defendant Timothy C. Abrahams. Upon the trial, the plaintiff proved that he had furnished materials for the defendant Elsie V. R. Abrahams, in and about building a house for her upon her own separate lands and premises, to the amount and value mentioned in the complaint, and that such materials were furnished upon the express agreement and appointment made by Mrs. Abrahams that the same should be paid for out of her separate estate. Judgment was rendered for the plaintiff for $484,06, damages and costs, to be collected of the separate property of Mrs. Abrahams. From this judgment the defendant Mrs. Abrahams appealed.

*M. J. Townsend,* for the plaintiff.

*J. A. Millard,* for Mrs. Abrahams.

HARRIS, J.   By the act of 1848, for the more effectual protection of the property of married women, (*Sess. Laws* 1848, *p.* 307,) it was declared, that the real and personal property of a married woman should thereafter be her sole and separate property, as if she were a single female.   Though Mrs. Abrahams was married before the act took effect, so that her husband would have a vested interest in such property as she had previously acquired, yet it appears, from the evidence in the case, that the lot upon which the building was erected for which the plaintiff furnished the materials in question, was purchased in November, 1848.   It having been conveyed to her in her own right, it became, by operation of the statute, "her sole and separate property as if she were a single female."   The act was an enabling statute, authorizing the wife to take and hold property to her sole and separate use.   Being capable of holding property, she was also capable of conveying it.   (1 *R. S.* 719, § 10. *Albany Fire Ins. Co.* v. *Bay,* 4 *Comst.* 9.)

We have, then, the case of a married woman holding separate property, and the question presented is, whether the plaintiff has shown such a state of facts as entitles him to have his debt charged upon it.   It is well settled that, at law, a married woman cannot make a contract which will bind either her person or her property.   It is equally well settled that, in equity, she cannot by contract bind her person or her property generally. But equity makes a distinction between her separate property and her property generally.   In respect to the one, she is regarded as a single female—in regard to the other, she is under the legal disabilities of a married woman.   It is not enough that the wife has contracted the debt.   It must also appear that she intended to charge her separate estate with its payment. When this is made to appear, it is within the jurisdiction of a court of equity to enforce such payment out of her separate estate, as a charge thereon.   Having the power to dispose of her own sep-

arate property, she has, of course, the power to charge it with the payment of her debts. A creditor, therefore, before he can succeed in charging the separate estate of a married woman with the payment of his debt, must show, not only that she contracted the debt, but that it was contracted, either for the benefit of her separate estate, or for her own benefit upon the credit of such estate. (*North American Coal Co.* v. *Dyett*, 7 *Paige*, 9. *S. C. on appeal*, 20 *Wend.* 570. *Curtis* v. *Engel*, 2 *Sand. Ch.* 287. 2 *Story's Eq. Jur.* §§ 1397 *to* 1401.) In such a case the debt is enforced as a charge, and not as a personal liability. The judgment is *in rem*, and not *in personam*.

The application of these well settled and familiar principles to the case in hand, is easy. Mrs. Abrahams was the owner of real estate. She held it to her own exclusive use. It was as free from the control or disposition of her husband, as though she had been unmarried. She had the right to dispose of it, and, of course, to incumber it, as she pleased. Under these circumstances she undertook to improve it. She obtained materials from the plaintiff for that purpose, and agreed to pay him out of her separate estate. The debt was thus created not only upon the credit of her separate estate, but for its benefit. The husband ought not to be, and I suppose could not be, made liable for it. The estate of the wife ought to be, and clearly is, chargeable with its payment. It is the province of a court of equity to declare and enforce that charge. The judgment at the circuit, therefore, so far as it goes, is right. It declares that the plaintiff is entitled to the payment of his debt out of the separate estate of Mrs. Abrahams. The effect of the judgment is to make the debt an incumbrance upon her estate. It is, undoubtedly, imperfect, in that it does not provide for enforcing the charge thus declared. It is not a case for issuing an execution. That mode of enforcing a judgment is only authorized when the judgment requires the party to pay money or deliver specific real or personal property. It is inappropriate where, as in this case, the judgment merely declares the plaintiff's right to have his debt paid out of a particular estate. (*See Code*, §§ 285, 286.) But this omission, while it renders a further ap-

plication to the court necessary before the plaintiff can take the effect of the judgment he has obtained, does not invalidate the judgment itself. I am of opinion, therefore, that it should be affirmed, with costs to be taxed.

In the case of Arthur Mooney against the same defendants, (tried before Justice WRIGHT,) the action was brought by another mechanic for work and materials furnished, under similar circumstances, for the same building. The facts in that case are substantially the same as in this. In that case the judge, at the circuit, nonsuited the plaintiff. If I am right in the view I have taken of the questions which these cases present, it follows that the nonsuit should be set aside, and a new trial granted, with costs to abide the event.

WATSON, J., concurred.

WRIGHT, J., (dissenting.) This action is against husband and wife. The plaintiff (Mooney) alleged in his complaint that at the request of the wife he rendered services in and about building a house for her; and also, at her request, furnished materials used for the building of the house; the services and materials being reasonably worth the sum of $287.50; and that she, in consideration that the plaintiff would furnish such services and materials, undertook and promised him that she would pay for the same out of her personal property and estate; and did appoint the same to be paid for out of her separate estate; yet she has wholly refused and neglected to pay for the services or materials or any part thereof. It is nowhere averred that Mrs. Abrahams has any separate property or estate, real or personal. The thing sought to be bound with the payment of the debt alleged to have been incurred is not described; nor are we told whether the debt was contracted for the benefit of the estate, or for the benefit of the wife upon the credit of any separate estate. The proceeding is not *in rem* to subject the separate property of a *feme covert* in equity to the satisfaction of her contract; but *in personam.* Judgment is demanded against the wife for the value of the services and materials, with the in-

Dickerman v. Abrahams.

terest thereon. True it is added, "to be collected of the separate property of said Elsie V. R. Abrahams." She may have none; and the complaint sets forth none, which a court of equity may, by its decree, subject to the satisfaction of the debt. The complaint is substantially in assumpsit against a married woman; and lacks most of the essential ingredients of a bill in equity to reach the separate estate of a *feme covert.*

But conceding that the complaint is sufficient, did the evidence make a prima facie case for the plaintiff? It is sought to charge the payment of a debt contracted for work and materials in the construction of a house, upon separate property of Mrs. Abrahams, a *feme covert.* To do this it is incumbent on the plaintiff to show that she has property, regarded in equity as her separate estate, and as to which she is to be considered and treated as a *feme sole;* and secondly, that the debt was incurred for the benefit of the separate estate, or for her own benefit, upon the exclusive credit of such estate; or that she expressly appointed the debt to be paid from such separate property.

On the trial, the plaintiff Mooney proved that in November, 1848, Clarkson F. Crosby conveyed by warranty deed to Mrs. Abrahams, then the wife of the defendant Timothy C. Abrahams, and to her heirs and assigns forever, a piece of land containing about five acres, situate in the town of Watervliet. The grant was in fee, and there was nothing in the instrument of conveyance evincing an intention to settle the estate upon the grantee for her separate use without any control over it on the part of her husband. The plaintiff further proved, that on this land a dwelling house was erected in 1852; and that the plaintiff Mooney furnished the sash and glass in the construction of the house; that one Nichol superintended the building of the house, and was told by Mrs. Abrahams at the commencement of the work, that it was her money which was to pay for building it. The plaintiff also offered to prove that by the direction of the defendant, Elsie V. R. Abrahams, he furnished the windows for the house spoken of by Nichol, as being erected on the lands mentioned in the deed given in evidence, to the amount mentioned in the complaint, and that she sent word by Nichol to the

defendant before the goods were furnished, that they were to be paid for by her. This was all the proof given or offered by the plaintiff; and the first and main question that arises is, whether Mrs. Abrahams was shown to have a separate estate, and in regard to which she is to be considered a *feme sole*. If she had a separate estate in the land conveyed, within the authority of the decisions in courts of equity, as the debt of the plaintiff was incurred for the benefit of such estate, if not for her own benefit, upon its credit, equitably payment should be enforced from it. I thought on the trial and am still of the opinion, that the plaintiff failed to show such an estate in Mrs. Abrahams, as courts of equity recognize her right to dispose of and control as a *feme sole*, and which she may bind by any contract or appointment in relation to it.

The estate of Mrs. Abrahams in the land was strictly a legal one. She took the fee. By marriage, at least prior to the statute of 1848, "for the more effectual protection of the property of married women," the husband acquired the usufruct of all the freehold estate of the wife during coverture. He was entitled to the rents, issues and profits thereof. The wife dying in the lifetime of the husband, the real estate of which she died seised descended to her heirs at law. At her death his interest therein was at an end, unless he had by her a child born alive which could have inherited the estate, if it had been alive at the death of its mother. In such case, the husband became tenant by the curtesy, for his own life. During coverture the lands were under the control of the husband; and the wife was incompetent to dispose of or contract in relation thereto. The estate could only be aliened in some mode recognized by courts of law. At common law, as a general rule, a *feme covert* could not make a valid contract of any description in relation either to real or personal property. She could not bind either her husband or herself by contract. Under no circumstances, in a court of law, was she considered or treated as a *feme sole* in respect to debts contracted or obligations incurred; and by the strict rules of the common law she was not permitted to take or enjoy any real or personal estate separate from or independent of her husband.

Dickerman *v.* Abrahams.

Nor in equity could she by contract bind her person or her property generally.

But the doctrine has prevailed for a long time in courts of equity, that a married woman may take real and personal estate to her own separate and exclusive use; and that she has also an incidental power to dispose of it. Such a thing has been recognized for a great length of time, as a separate equitable estate in the wife, in real property. But it is strictly an equitable estate, and has always been created by deed, by will or marriage settlement, vesting the legal estate in some third person. A legal estate of inheritance never could be merged in an equitable estate, so that the whole should become an equitable interest only; and it is only strictly equitable titles, which courts of law do not recognize, that may be transferred by a married woman as a *feme sole*. Originally, it was deemed absolutely necessary that the property of which the wife was to have the separate and exclusive use, should be vested in trustees for her benefit. Indeed the power of a court of equity to manage and control the separate estates of married women arises from its jurisdiction over trusts. But for more than a century it has been held that the intervention of trustees is not indispensable; and that, whenever real or personal property is given, or devised, or settled upon a married woman, either before or after marriage, for her separate and exclusive use, without the intervention of trustees, the intention of the parties shall be effectuated in equity and the wife's interest protected against the marital rights and claims of her husband, and of his creditors also. Her husband has been held and treated as a mere trustee for her, and prohibited from disposing of her separate property, to her prejudice. (*Story's Eq. Juris.* § 1380.) But the intention to devote the property given, secured or bequeathed to the wife for her separate and exclusive use, must clearly appear beyond any reasonable doubt; otherwise the husband will retain his ordinary, legal and marital rights over it. It must appear by the terms of the gift, settlement or bequest, that the property is expressly or by just implication designed to be for her separate and exclusive use, or the marital rights of the husband will not be ex-

cluded. If it be real estate, the intention must appear from the instrument giving, securing or devising it. I venture to say that it was never before pretended that where real estate was granted or devised to a married woman, by a third person, in fee, and without any express declaration of a trust, or any words or act from which the intention might be justly implied, to devote it to her separate and exclusive use, it was a separate estate in the wife, to the exclusion of the marital rights of the husband. A married woman's own lands are not her separate estate within the meaning of any equitable rule or authority.

This was the settled law prior to the statute of 1848, in which the legislature undertook to entrench upon the marital relations as understood and established by the common law. It remains to be seen whether that statute converts the lands of a married woman, held in fee, into a separate equitable estate, merging the legal into the equitable so as to give a court of equity control over it by virtue of its jurisdiction and power over trusts. The counsel for the plaintiff evidently supposes this to be the effect of the statute.

It is to be observed, that the statute, being in derogation of the common law, is to be strictly construed. No rights or powers of the wife or invasion of the marital rights of the husband, are to be implied; and it is not to be deemed to override any principle of the common law, or enlarge the jurisdiction of a court of equity, unless by its express terms it irresistibly calls for such a construction. If by its express terms it converts the legal estate of a wife into an equitable estate, and makes what was heretofore an estate in her own right and controlled by her husband, that which has been regarded by courts of equity as a trust interest, we should so declare it. In putting a construction upon its provisions, we are also if possible to ascertain the intention of the legislature; and in this case it is of the highest importance to consider the question, whether it entered into the legislative intent to convert a legal into an equitable estate, or to give any other or different signification of a *separate estate* than had been recognized in equity for more than a century.

The act provides that the real and personal property, and the

Dickerman *v.* Abrahams.

rents, issues and profits thereof, of any female now married, shall not be subject to the disposal of her husband, but shall be her sole and separate property as if she were a single female, except so far as the same may be liable for the debts of her husband heretofore contracted : and the third section of the law of 1848 contains the further provision, that it shall be lawful for any married female to receive by gift, grant, devise or bequest, from any person other than her husband, and hold to her sole and separate use, as if she were a single female, real and personal property, and the rents, issues and profits thereof, and the same shall not be subject to the disposal of her husband, nor be liable for his debts ; but all contracts made between persons in contemplation of marriage shall remain in full force after such marriage takes place. This third section, as amended in 1849, authorizes any married female to take by inheritance, or by gift, grant, devise or bequest, from any person other than her husband, and hold to her sole and separate use, and convey and devise, real and personal property, and any interest or estate therein, and the rents, issues and profits thereof, in the same manner and with the like effect as if she were unmarried, and the same shall not be subject to the disposal of her husband, nor be liable for his debts.

At common law the real property of the wife could not be aliened by the husband, nor was it subject to his disposal. He was entitled to its use, or the rents, issues and profits thereof during coverture. The personal property owned by the wife, at marriage, belonged to the husband if reduced to his possession during coverture, and was liable for his debts; and the same rule applied to any personal property given or bequeathed to the wife during coverture. A married woman could always take by inheritance, or by gift, grant or devise, from a person other than her husband, real estate, and it was not subject to alienation or disposal by her husband. So far, therefore, as the wife's ownership of land was concerned, and mode of holding, the statute does not change, or in any way modify the common law rules. Nor was it within the intention or policy of the legislature to change the law of real property in this respect. The purpose to be attained

by legislative action was to protect the property of married women from disposal by their husbands, and that it should not be subjected to the payment of their debts ; not to change the mode of holding, or so far to intrude upon the marital relations with respect to the control and disposition of all the wife's property as to build up and establish rival and independent interests in the same household, and whilst the husband was still liable for the debts and maintenance of his wife, he could not even become tenant by the curtesy in her real property. All effected, or intended to be, by the second section of the act of 1848, was to alter the common law rules, with respect to the husband's interest in the rents, issues and profits of the wife's real estate, and of her personal property. That which was before subjected to the disposal of the husband, and was liable for his debts, was no longer to be so ; but was to be treated and considered, in law, as her sole and separate property, as if she were a single female, except so far as the same might be liable at the passage of the act, for the debts of the husband already contracted. The section effectually stripped the husband of the usufruct of the wife's real estate, and so far invaded his common law marital rights ; but it could not have been contemplated by the legislature, in the use of the words, "it shall be her sole and separate property as if she were a single female," to convert what was already a legal estate into an equitable one, or to enlarge the powers of a court of equity, nor to convert an estate in her own right into a mere trust estate, which she could not manage or control without invoking the powers of a court of equity. All the right given in the third section of the law of 1848 was exercised before the passage of the statute in a court, of equity ; and where it was manifest that the intention of the donor was to devote the gift to the sole and separate use of the wife, it was held in trust for her exclusive benefit, and was not subject to the disposal of her husband, nor liable for his debts. The wife's real estate, at law, could not be disposed of by her husband, but as he had the use of it, was held by him during coverture. She could not, in a legal sense, *hold* property. All that this section did was to qualify her in law to hold her own

Dickerman *v.* Abrahams.

property, and to effectuate the prominent intention of the law-makers by placing it beyond the reach of the husband, and preserve it intact from disposition by him, or liability for his debts. It did not assume to relieve the husband from his common law liability for the debts of the wife ; nor to authorize her to contract even in relation to her own property. It merely authorized her to hold at law ; but it created no such estate as was before known in equity as a separate estate, and liable equitably for the engagements of the wife. The legislature had made it lawful for her to hold her own property without the intervention of a trustee, but no power had been given to her to dispose of it. The disposition of her personal property and of the rents, issues and profits of her real estate had been taken from her husband, and lodged nowhere. A court of equity could not control it, except so far as it came within the purview of an equitable estate as settled by a long line of authorities. She had at common law no power to contract, and hence could make no legal disposition of it herself. In this dilemma, the legislature of 1849 found the wife ; and to apply a remedy the third section was remodelled. The power to take by inheritance, or by gift, grant, devise or bequest, and hold to her sole and separate use was retained ; adding the further power to convey and devise real and personal property, and any interest or estate therein, and the rents, issues and profits thereof, in the same manner and with the like effect as if she were unmarried. The inartificial manner in which this amended section is constructed has given rise to different views as to its meaning. The words " convey and devise" are technical terms relating to the disposition of interests in real property. It could not be technically or legally correct to speak of *conveying* personal property by a verbal sale of it, or of *devising* it by a last will and testament. Real property may be conveyed by deed or devised by will. Prior to the act the wife could only convey her real estate in the mode prescribed by statute for its alienation by deed, viz. by joining with her husband in the conveyance, and acknowledging the instrument separate and apart from him ; and she could not *devise* it at all. Hence has arisen the serious doubt,

whether the statute so far nullifies the common law as to give the wife power to contract at all in relation to her personal property, or to do any thing with her real estate, further than to dispose of it by deed, without joining with her husband in the conveyance, or *devise* it by will. Certainly, if the power be given to her to manage and contract as respects her property further than this, it is by implication. If she is authorized to contract generally, the power is not given in express terms; and in this way the marital rights cannot be invaded, or the principles of the common law subverted. I think that the most that the legislature intended originally was to protect the personal property given, or bequeathed to the wife, and the rents, issues and profits of the wife's lands, from disposal by the husband, and from liability for his debts; and so far as the personal property, the rents, issues and profits of her real estate were concerned, to remove the common law restriction against a *feme covert* holding this species of property, independent of her husband; it required more boldness than the lawmakers of 1848 possessed, to strike down, at one blow, all those marital relations that had impressed on them the sanction and wisdom of ages. Nor did the legislature of 1849 accomplish, or mean to do, what their predecessors had left undone. They found the wife clothed with the power, independent of her husband, to hold her own property: but having no power herself or lodged anywhere else, to dispose of it in the event of her necessities requiring such disposition. This they proposed to obviate, and nothing more; and this was done, whether to an enlarged or limited extent it is unnecessary to inquire in this case.

It is quite apparent that the tendency of the legislation referred to was to favor the wife. It in nowise entered into its design to impose burdens on her or her property unknown to the common law, and to a like extent relax those of the husband. At common law the husband was liable for the debts of the wife, or of those contracted for her benefit, or in the management or improvement of her estate. It made him liable for the very debt sought in this case to be enforced against the wife; and it could not at least be collected from her. But, if we adopt the

Dickerman *v.* Abrahams.

conclusion that the statute converts what was a legal into an equitable estate, alike in all respects to that previously recognized in equity, and subject to the same rules, the effect would be to impose a burden upon the wife's real property; and this too, for aught we see, without relieving the husband. Though the usufruct of Mrs. Abrahams' real estate has been taken from her husband, the statute does not discharge him from the payment of this identical debt, sought to be enforced against property, said by operation of law to be converted into that kind of *separate* estate, which in equity, and by the powers exercised by a court of equity, has been heretofore decreed to satisfy contracts or debts of the wife. That the legislature did not intend to convert the wife's legal estate into an equitable one, putting her with regard to all her property on the same footing at law, as had been before recognized in equity, in relation to property given, secured or devised for her separate and exclusive use, is also apparent from other sections of the act of 1848, and the same act as amended in 1849. The fourth section of the act of 1848 expressly declares, that ante-nuptial settlements shall be valid; and it was principally through the medium of these, that the whole doctrine of a separate estate in the wife grew up in equity. So, also, the second section of the amended law of 1849 recognizes, as a thing still to have an existence, that kind of separate estate which courts of equity had exclusively assumed to control, and for whose benefit, or on the credit of which, the wife by appointment could bind. It authorizes any person who may hold, at the passage of the act, or thereafter hold, as trustee for any married woman, any real or personal estate under any deed of conveyance or otherwise, on the written request of such married woman, accompanied by a certificate of a justice of the supreme court as to her capacity to manage and control the same, to convey to such married woman by deed or otherwise, all or any portion of such property, or the rents, issues and profits thereof, for her sole. and separate use and benefit.

My conclusions are, 1st. That the deed from Crosby to Mrs. Abrahams gave her no such separate estate in the land conveyed that a court of equity had assumed to control, and with regard

to which the wife had been considered and treated as a *feme sole*. It was not a conveyance upon any trust, express or implied. There was no intention evinced in the instrument of conveyance, or to be gathered from the acts of the parties, that the estate was to be held for her sole and exclusive use. The land was directly conveyed to her, and in law she took the fee, subject to the common law rules as to real property. The title was in her absolutely; and a court of equity had no power or jurisdiction in respect to the estate granted. 2d. That the statutes of 1848 and 1849, " for the more effectual protection of the property of married women," do not convert this mere legal estate into an equitable one, bringing it within the jurisdiction and powers which a court of equity had heretofore exercised over trusts, and fashioning it into that kind of *separate estate*, held in equity to be subjected to a satisfaction of the contracts or debts of the wife, or which she might dispose of by appointment. These laws took away from the husband the use of the wife's real estate; but did not absolve him from the payment of her debts, or make her property, in law, liable therefor. They conferred no new powers or jurisdiction on a court of equity, and having none heretofore over the legal title, it is still without them.

It follows of course, in this case, that if Mrs. Abrahams was not shown to possess any such *separate* estate as could be subjected in a court of equity to a satisfaction of her debts, it was quite immaterial whether she had or had not appointed them to be paid therefrom. Having none, or none being shown, the plaintiff failed to make a case entitling him to recover, and was properly nonsuited.

In the case of *Dickerman,* judgment affirmed.

In the case of *Mooney,* new trial granted.

[ALBANY GENERAL TERM, September 4, 1854. *Parker, Harris* and *Wright,* Justices.]